Thank you, Your Honor. Good morning. May it please the Court. My name is Leonard Feldman. I'm counsel for the appellant, Jacob Barrett. I'd like to reserve three minutes for rebuttal, but I'll keep track of my own time. This appeal is now before this Court for the second time, and the same basic question is still at issue. That question is whether prison officials violated Mr. Barrett's First Amendment rights when they punished him for using offensive language in outgoing correspondence. The defendants are arguing today that this Court should affirm the district court's dismissal order for three reasons. First, that Mr. Barrett's claims for injunctive and declaratory relief are moot. Second, that they did not in any event violate Mr. Barrett's First Amendment rights. And third, that his claims for damages are barred by qualified immunity. I'd like to take those arguments in order. As we note in our briefs, there are two cases that squarely address the mootness issue. One is this Court's opinion in Lemaire, and the second is the Oregon Supreme Court's decision in Barrett v. Bullock. In both of those cases, the Court held that ODOC's decision to transfer an inmate to another institution pursuant to the Interstate Corrections Compact does not moot the inmate's claims. In response to Lemaire, defendants have claimed that the decision has been criticized and that it was premised on an ongoing injunction. They never say who criticized Lemaire or why any such criticism matters. Well, Judge Noonan criticized it in dissent. Pardon me? Judge Noonan criticized it in dissent. Well ---- But that means he lost. He was outvoted by two other judges. He was also outvoted, if you could use that term, by the Oregon Supreme Court, which reached the exact same reasoning in the Barrett v. Bullock case. I've got a question that may make the mootness issue a little easier, depending on what turns out to be the answer. In our earlier precarium, we stated that as a result of the discipline imposed upon Mr. Barrett arising out of these three letters, he lost good time credits. Is that true? He has testified that he lost good time credits. That is his testimony. The defendants have taken issue with that, but he has testified to that effect. And the testimony of the defendants, at the very least, acknowledges that the parole board has discretion to release Mr. Barrett early. That's the declaration of Bethany Smith. Now, if it is true that he's lost good time credits as a result of this discipline arising out of these letters, am I right in assuming that if we were to hold that the letters were protected under the First Amendment and the discipline, therefore, was improper, that the good time credits should be restored? Yes. That's absolutely correct. So there's two reasons or two ways to address the mootness issue. One is just to apply the plain language in the Interstate Corrections Compact, as set out in Lemaire and Barrett v. Bullock. And the other is to address it on the facts, as Your Honor has. The violations continue to have an impact on Mr. Barrett's incarceration. That's enough to conclude a mootness finding. That would mean, then, that even if the damage claims against the individuals are not valuable because of qualified immunity, the prospective or declaratory relief is still at issue, and we can't duck the First Amendment issue based on qualified I completely agree. Yeah. And that, in fact, is how the defendants have structured their brief, with the mootness issue coming first and the merits issue coming second. And on the merits, we have a very similar issue. On mootness, we have two cases that are directly on point. On the merits, we've got at least five cases that are directly on point. We have the Supreme Court's decision in the Procuniae case. We've got Brooks. We've got Loggins. We've got McNamara. And we've got Bradley. And you've got Nix. How do you get around Nix? Nix is a pretty easy case to get around. What happened in Leonard v. Nix is that there was a habeas ‑‑ there was a state court finding that the letters that Mr. Leonard wrote were not, in fact, directed to an outside correspondent. Instead, they were directed specifically ‑‑ Well, they were directed in sort of informal terms. That's what the letter said. Right. But that's not what the state courts found. The state courts found that they were not a sincere effort to communicate with an outside correspondent. And the Leonard v. Nix court took that and was unable to, I guess, reason around it. But what's interesting about Leonard v. Nix is that if the letter that Mr. Leonard, in fact, sent was not, in fact, directed to an outside correspondent, but was instead directed to an inside correspondent, the Leonard v. Nix court should have applied the Turner v. Safley test. They didn't do that. They didn't apply any test. They simply said that we're bound by this state court ruling, and so, therefore, it doesn't come within procuniae. Well, if it doesn't come within procuniae, it has to come within something. And that would have been Turner v. Safley, which ‑‑ I'm not asking you to concede that it's the fact here. But if it could be shown, I'm not asking you to concede this, that your client was addressing letters to his mother and his grandmother, that is to say, that's what the envelope said, in the expectation that the letters would be opened by the mail staff, the letters would contain this stuff, I won't characterize it for the moment, and that they would be handed over to Mr. Knopfseger, and that Mr. Knopfseger would then read this stuff. And so let's assume, then, that Mr. Barrett's intention is that they should go to Mr. Kuehler's route. Are they then protected under that circumstance? They're still protected. And the reason they're protected is because what the case law makes clear is that it's not whether the letters are inflammatory or threatening. That's not relevant. What's relevant ‑‑ I'm sorry, what? What is relevant ‑‑ That it's not relevant that they're threatening? That's correct. What's relevant ‑‑ Where do you derive that? That comes from procuniae. I think ‑‑ And let me explain what I ‑‑ Because what procuniae talks about is ongoing criminal activity, threats of extortion. Threats, yes. Right. Threats. Threats against prison staff. Things that, Your Honor, threaten the safety and the security of the prison. That's what they're talking about. And maybe I'm splitting hairs, but ‑‑ One of the issues in this case is whether there were threats. Right? And I would say there were no threats. If these are veiled threats, which is the argument that the prison makes, and they were veiled threats against the prison staff, that certainly is not protected under procuniae. Procuniae was a facial challenge to regulations that made categorical statements. But procuniae certainly recognized that there are legitimate interests if there's bounce back, if you will, or there's some impact on internal prison management. Yeah, and I agree completely with that latter point. Some impact on prison management. If the defendants here had allowed these letters to be delivered to Mr. Barrett's grandmother and his mother, there would not have been any impact at all on prison management. And the defendants here have never explained how anything in those letters could have any impact at all on prison order and security. The letters would have been read and thrown away, and it would have been very similar to the situation that this Court described in Bradley, that it would have no impact beyond a prisoner's mere thoughts. What does the content of the letters referring to the Aryan Brotherhood and the code for the terrorist organization that are barred, is that a factor in the analysis at all? He's allowed to invoke Aryan Brotherhood and ---- Sadly, Your Honor, I think that's just his views at the time. Okay. He was, maybe he is, but he certainly was a racist individual, and he wrote racist letters to his mother and his grandmother. There was nothing in those letters that would have had any impact on prison order and security had the defendants permitted the letters to be delivered. The letters, in part, took a very favorable, encouraging view about inmates in prisons taking retribution against Jews by beating one to death. Right. And I'm Jewish, and I found that to be offensive. But that's Mr. Barrett's views. Well, but if the idea was that that was encouraging his wife or mother or grandmother or whatever to go to his outside colleagues or to get information back, would that be the kind of thing that the prison could be concerned about? Yes. Yes. I think that if he had written a letter to somebody on the outside and said, speak with Jim Smith and make sure that Officer Knopfziger gets killed, that that's exactly the kind of letter that would have an impact on prison order and security. But there's no evidence that his mother or his grandmother could do that. The prisoners argued that one of its interests is in sort of curbing the prisoner's appetite for this kind of hate speech and that it is a matter of sort of discipline and reform, a matter of rehabilitation for them to suppress Nazi symbolism and other things that were associated with the Aryan, this Aryan group. So what about that? Well, I think that when you're talking about communications within a prison, that is an absolutely important and compelling interest. When you're talking about communications outside of the prison, then it no longer has any impact. And Martinez made that clear. And if Martinez didn't make it clear, I would submit that Thornburg made it even clearer. You can't have your mother writing back and saying, got your letter, you're exactly right, go, boy, you know, keep at it. And without anything else, so no 1488, no swastikas drawn on that, would that be a problem? The incoming letter is governed by the Turner v. Safley test. So they may be able to censor the incoming mail. But that doesn't change the outgoing correspondence, which is governed by the Procunier test. And what the Court said in the Thornburg case referring to Procunier, quote, That's what the U.S. Supreme Court said. And it is completely and entirely fatal to the defendant's arguments in this case. I'm having trouble in this case understanding these inflammatory and offensive statements in the letters. Because I don't have the letters. I confess these are not letters I would have written to my mother or grandmother. And maybe I'm not the right judge of what someone would write to his mother or grandmother. I would be helped to know, to sort of figure out whether or not these were genuinely sent to mother and grandmother with the intent that it actually should go to them instead of by this route back to Mr. Knopfseger. If I had the full letter. The defendants destroyed the letter. I'm getting to that point. I know that in your brief you've said that we've got a spoliation of evidence problem, that the defendants had the letters in their possession at the time the lawsuit was filed and destroyed them after the lawsuit was filed. What's the basis for that statement that they had the letters when it was filed and they destroyed the letters after the suit was filed? There is a declaration submitted by one of the defendants that admits that point. And I apologize. I don't have the E.R. citation. You'll have a moment and we'll ask the other side if that's a contested point. Pardon me? You'll have a moment while you're listening to their argument. I'll ask the other side whether that's a contested point. Okay. Thank you, Your Honors. Thank you. May it please the Court, counsel. I'm Christina Hutchins representing the State of Oregon in this case. I'm going to start out by first acknowledging that we are making three arguments and the same three arguments that the district court found, actually, in this case for why the district court was correct. And that is that plaintiff's injunctive or claims for injunctive relief and declaratory relief are moot because he has since been transferred to a different prison. He's no longer subject to the ODOC prison rules that he claims were violated as applied to him. There is no facial challenge here, just an as-applied challenge. So he can still get damages? That's correct. It's not moot. If he got past the qualified immunity defense, which is also. . . I understand that, but the case doesn't go away if he doesn't get injunctive or declaratory relief. Correct. Okay. Thank you. And also that the district court correctly surmised that there is no clearly established that was violated by the prison officials in this case when they, looking at the letters that the plaintiff wrote to his, purportedly to his mother or his grandmother, that the type of direct and implied threats and violence, racist epithets, all of the diatribe is how it would be characterized by the Eighth Circuit and also by the district court in this case, that that type of correspondence, outgoing correspondence, is not protected by the First Amendment, that when the prison, in being able to advance an important governmental interest, one of them being rehabilitation, that there's a necessity of being able to correct this type of behavior that's not acceptable to society in general. And that in a situation here where the district court did make a finding that the plaintiff, the prisoner, was not actually attempting to correspond or communicate with his mother or his grandmother. These were. . . Let me ask you the point that I addressed at the very end of the other side's argument. At the time the suit was filed, did the prison or did the State have in its possession these letters? I'm not sure if that. . . I'm unclear about the record. And why are you unclear? They say that there's a statement in the record that says that they did have them. We did at one time have the letters. I do not know if we had them at the time it was filed. And then they were destroyed after this court, or after the district court dismissed the complaint, because the complaint was dismissed sua sponte by the trial court in the beginning for failure to state a claim for relief. And when that happens, the AG's office doesn't actually get a copy of the complaint. So no lawyers were involved at that time. I'm not sure I understand what you're saying. What you just said suggests to me that you're telling me that the State did have the letters when the suit was originally filed. Is that what you're saying? When the suit was originally filed, I'm not clear. I know that we did have them at one time, and that we subsequently destroyed them pursuant to, I think, our record retention policy. I'm not sure if that occurred, the destruction, after the plaintiff's complaint had initially been dismissed by the district court. Because, again, this is the second time we're up here in the Ninth Circuit Court of Appeals. The first time is when they appealed the district court's dismissal of their complaint for failure to state a claim for relief. I don't know if the destruction occurred when there was no longer a complaint. That is to say, so you're saying, I don't want to put words in your mouth, but what I think I'm hearing you saying is that your client did have the letters when the first complaint was filed, and they destroyed them at some point after that first complaint was filed. Are you saying that or not? I'm saying I don't know that. Oh, you're saying you don't know. Yes. Okay, I got it. Could I just ask another question? There's no copy of any policy. What we get is Mr. Long's declaration, who actually, you know, has statements in it and the letters that are in evidence. I mean the declarations are in evidence. Not only do we not have the original letters, we don't have the policy. Is there a written policy? The ODOC rules, yes, and the district court actually cites them in his opinion. I know he cited them. Do we have copies? Is there a written policy that the prison has? There are written or promulgated ODOC rules. And those are in the record? They certainly should be in the record. Okay. Let me ask you the question. Again, this goes back to mootness. I'm sorry we're jumping around. But in our procurium opinion, when it was up here before, we wrote that as a result of the discipline imposed based on these three letters, he lost good time credits. We simply wrote that. Is that true? No, he did not lose good time credits. And that wasn't something that was briefed or in Kelly's brief to this court, that that was a reason that this case was not moot. No, I understand about the reason. But there is a clear statement in our procurium opinion the last time it was here that says as a result of the discipline arising out of these letters, he lost good time credits. And were we wrong in so stating? Yes. And what's your evidence that he did not lose good time credits? There's a declaration from someone at the, I believe it's an employee of the parole board or ODOC that says because of the type of sentence that he was serving, he wasn't eligible for good time credits. The only evidence in the record was that he was sanctioned by fine, solitary confinement, and loss of privileges. There was absolutely no indication that he lost good time credits. There's a statement from him that he lost good time credits. His testimony was that he lost good time credits. But I believe that the district court found the evidence that he, in fact, did not lose good time credits more persuasive. But if that's so, that's a disputed question of fact. And we're here on summary judgment. And if it's a disputed question of fact as to whether or not he lost good time credits, that means as to prospective relief, it can't be moot because it's a question of fact as to whether he did or did not. Had Appellee's briefed that issue in their initial brief, I would have had more opportunity to respond to that. But my understanding is the district court found that there was not a disputed fact about whether or not he had lost good time credits, that he, in fact, did not lose good time credits. I would have to go back and look at the concise summary statement of facts that were presented to the district court. But clearly the district court both times, both the magistrate and the district court, found that he did not lose good time credits. Okay. Let me ask you, putting the good time credits off to one side, how do you get around the footnote in La Mer written by Judge Trott, and how do you get around the conclusion in the Barrett case decided by the Oregon Supreme Court? The Oregon Supreme Court says that even though he is in Oklahoma, because that was the circumstance in front of them, that the treatment he was receiving in Oklahoma was sufficiently likely to be influenced by the discipline he had received while in Oregon that it was not moot. That strikes me as a difficult thing for you to get around. In the Barrett decision, I'll start with that one first, that had to do with classification of how he should be serving his incarceration. It had to do with an IMU. It had nothing to do with prison rules or regulations. And in that case, the Oregon Supreme Court said there was some evidence that the fact that he had been held in IMU in the Oregon prison carried over to how the Oklahoma prison was going to classify him as a prisoner. But it had nothing to do with the situation here where you have ODOC rules that have to do with mail that is not going to be in any way subject to that. I understand that in terms of mail going out of Oklahoma. Whatever mail goes out of Oklahoma prisons, that's going to be up to them. But on the same reasoning as in the Barrett case from the Oregon Supreme Court, the Oregon Supreme Court says his disciplinary record while he was in Oregon will influence how he's going to be treated in Oklahoma. Well, he's got discipline arising out of these letters. And why does that not have, then, the same idea in the sense of possibility of influencing the way he's going to be treated in Oklahoma? Well, I guess my reading of Barrett is that it had more to do with the classification than it did with the disciplinary record. But there's no evidence here that the plaintiff has put forth that his disciplinary record is somehow affecting how he's being treated in Oklahoma. And this is a situation this circuit has had many times, where you have a prisoner challenging particular conditions of confinement or rules or policies in one prison and is subsequently transferred out of state to another prison and is no longer subject to those rules or policies. And consistently, this circuit has said that that renders it moot. Well, it seems to me that's clearly right with respect to any future regulations, with respect to mail and so on. My question really goes to is there some impact from the imposition of discipline? But I understand your answer. How do you get around the footnote in LaMere? My understanding of that case is that there was an ongoing injunction that the court took into consideration in determining that it wasn't moot, and also that the court used, I think, misapplied the capable of repetition yet evading review. I think a more correct statement of how that exception to the mootness is in this Court's recent case, the Alvarez, Blackie v. Alvarez, where it says that that is limited to very extraordinary circumstances. And I would argue that it was misapplied in LaMere. Well, I think it might have been. On the other hand, that's the rule. I mean, I can't say I disagree with majority in LaMere, and therefore I'm going to disregard it. So I think we have to take it as the correct statement of law rather than, well, it's wrong. I think you can factually distinguish it on the fact that there was an ongoing injunction. And where's this question of ongoing injunction? That's in the same footnote. I read the footnote, and I'm not sure what was meant by ongoing injunction other than the fact that there was an injunction arising out of the treatment of LaMere. And once that injunction's — once LaMere's no longer there, the injunction as to LaMere goes away. That's — I'm not certain how that — Okay. Got it. Assuming that the prospective relief is not moot, and I'm not asking you to concede, and I think it's kind of a close question, but assuming that the prospective relief question is not moot, we can't duck the First Amendment question based on qualified immunity, which we clearly can do and the district court did with respect to damages against the officers. I got that part. But if the prospective relief question is a live question, we have to decide whether or not this was protected under the First Amendment. And I'm having trouble seeing how a letter or three letters bona fide directed to mom and grandmom containing this language is a threat that can be disciplined. I understand, I think, more readily if this was a Nicks case, which it might have been, where he really was not writing to mom and grandmom. That was the address on the letter, but he knew darn well it was going to go back and go to Mr. Knopfserger, and that these then were statements to him for which he could be disciplined. I think if that can be shown, he's probably in trouble. On the other hand, if these are letters that truly were addressed to his mother and his grandmother with the expectation that they would go to his mother and his grandmother, I have trouble seeing the statements in there, offensive as they may be, as threats. Can you respond? Well, I think the district court did, looking at what the content of the letter was, inferred from that that defendant, in fact, or plaintiff, in fact, was not attempting to have genuine communication with his mother and his grandmother. But on that point, I've got trouble because I don't have the letters. I wish I had the letters, and I maybe could make a better judgment as to whether or not they were truly sent to mom and grandmom. Assume for a moment without, I don't ask you to concede, assume for a moment that the letters were really just addressed to mother and to grandmother and were not intended to come back to Mr. Knopfserger. How is the language in those letters properly construed as a threat warranting discipline? I think if you look at the context, or the letters that are quoted, I think that both parties agree the parts of the letters that were provided are not simply just vulgar and offensive language. They're implied threats. So tell me what specifically, what's in there that you would regard as a threat? I think the district court, in his opinion, quoted the... Well, why don't you go to the letters instead of piggybacking on the district court? It would be helpful if we take a look at... There are three of them right there. There is language. I mean, it's quoted in the long... Right, I quoted it in... ER-225. When you're responding, there's some statements in the Notice of Imposition of Discipline that makes a conclusory statement, therefore poses a threat to the safety, security, and orderly operation of the facility. But in terms of what they charged him for, it's the hostile and abusive language. So the disconnect I'm having, and I think Judge Fletcher is suggesting it as well, is that the contemporaneous documents imposing the discipline make reference to the offensiveness of the language. But offensive language is one thing. A threat, a threat of physical violence, or an implied threat, which is my understanding of what you're arguing on appeal, is not what's articulated in the disciplinary actions. So I'd like you to explain that as you're responding to Judge Fletcher's question. I think the implied or thinly veiled threats have to do with not only all of the offensive language that he uses, but he also compares certain physical violence that occurred against individuals and inmates and suggests that that is something that should happen to Knobziger, for instance. So give me the language. All right. I'm quoting from page 5 and 6 of the red brief. You know, plenty of this. It's easier for me if you just look at the letters, or rather the excerpts of the letters that we have. You can find them on ER 204, 205, 206. I don't have the excerpt of record. Oh. That's not helping. I didn't bring all of the volumes of the excerpt of record. Surely you have the disciplinary forms. Do you have Mr. Long's declaration? Thank you, counsel. All right. All right. So on ER 206, it talks about, funny thing is they just murdered Earl Krugel, former JDL member in federal prison, crushed his head with a cinder block. Good times. There really is justice in the world. Hail Hitler. There's a swastika. It really does a heart good to know a scumbag like that got his dues. I sure would like to shake the POW who crushed that cuck's head isn't like a grape. And I know that. Isn't that a threat? I think when it's directed at, it's written in a letter that he knows is going to be read by prison employees, and right before or after that he's talking about Knopfniger and comparing them to, comparing Knopfniger to these two other, Knopfniger, excuse me, these two other inmates that have been violently. The closest language he had was the language where he said that he'd like to get Knopfniger in the ring so he could beat him legally. Right. That was the language that the district court cited as language. But that's hard to find that that's a threat of violence. He said he'd like to get him in a boxing ring so he could beat him legally, and that doesn't sound like the kind of threat that says, gee, as soon as I can get out of here, I'm going to take care of him. I think in the context of everything that he was writing in those letters, it certainly was a thinly veiled threat. Certainly that's what the prison officials determined. Short of making threats against prison officials, does the prison have the right to discipline him for rehabilitative purposes or because he said disrespectful things about him? Well, certainly they could if it were directly to prison staff. The question is what... But he understood that they were going to go through Knopfniger first. Okay? So he might have had dual motives. That is, if he can get Knopfniger on the way to sending the letter to Grandma and Mom, does the prison have the right to discipline him in that case? So no question, the letters are... He intends the letters to be mailed to his mother and grandmother. But he understands that... But he knows that the letters are going to be routed through Knopfniger first. Under those circumstances, I think Martinez has never stood for the proposition that you can verbally abuse and violently threaten prison employees and get away with it simply by sending the letter to your brother or your grandmother. I mean, that's not what Procuner had, the facts that Procuner had. In a situation here, I think for rehabilitative purposes, yes, we could. Can we come back to the... I don't know if you have the document. I'm looking at ER 231 where that letter is excerpted and reported. This is the Department of Corrections misconduct report. And after quoting what we've been talking about, the boxing ring and so on and so forth, the conclusion is, in this letter, inmate Barrett directed hostile and abusive language about multiple Department of Corrections staff involving racial and religious harassment. This challenges the authority of DOC staff and causes a threat to the safety and security of this institution. This inmate is well aware of the rule on disrespect. Inmate Barrett states that he has been written up for this in this letter. The inmate is intentionally violating the rule on disrespect. It does not make the argument that... or make the statement that this was an implied threat against Nofsinger. Didn't even take the boxing metaphor and run it to the conclusion of directing a physical threat. It was characterized as disrespect. So what should we do with that? I said not completely understanding your question. Well, it's not... You're arguing it's an implied threat. That's not what it says. It says he's cited for disrespect. I believe if you look at the ODOC rule that was applied to this, it includes the language that it's threatening. That's the rule, ma'am. That's the rule, okay, that you can violate it for several reasons. They didn't cite the threat, other than to say the disrespect is a threat. And that runs headlong into precuniae, which is abusive language about... or bigoted language against prison staff isn't enough unless there is some kind of notion that it in fact plays back into the prison. Now, one way it can play back into the prison, arguably, we've been talking about, is that it's a subterfuge for him to get back at the people within the prison and therefore shift it over more into the Turner side of things. But when the guards intercept, read, and the authorities intercept and read and quote the offensive language, they don't say he is making a threat against Nofsinger. They say he's being disrespectful of Nofsinger. Now, do you see the distinction? I understand the distinction that you're drawing. I'm not sure that I agree with it. Well, why wouldn't they, if they thought it was a threat against Nofsinger, have said so in this disciplinary report? Well, looking at the declarations that were submitted and the concise summary statement of facts, I believe that that is part of what's in the record, is that they believe... That's not... Okay, look. When the declarations are after the fact, okay, declarations are prepared in connection with litigation, one of the things we always look at is, okay, what does the contemporaneous documentation say about it? And that's all I'm trying to get you to focus on. The contemporaneous documentation, where they characterize, quote the letters, and ascribe to them the violation for which he is being disciplined, pick on disrespect. They don't go to the other aspect of the regulation or the rule, which punishes threats, prohibits and punishes threats. And if they thought that this language was a threat, why didn't they say so? Then, not in some later declaration. I guess I don't have a good answer for that. Okay. Okay, thank you. Response. Why don't we give you two minutes? We took the other side over by quite a bit. Let's start with two minutes and see what happens. Sure, and I'm not sure I need two minutes. Okay. But I do want to address a couple of the issues. One is to answer the panel's questions about spoliation. Okay, if you don't think you need two minutes, I would like to follow up then on the colloquy I just had. Taking the other side of it, why, under precuniae and the generalized statements it makes, because there was no – that was a facial attack on regulations. Okay. Precuniae did not have the kind of language and overlay of all of the other things that are going on in this case. And in citing to the Federal Bureau of Prisons as a model rule and to the modified California rule suggesting both of those were appropriate, they did focus on threats. Implicitly, the court indicated, you know, we understand that there are real problems in managing these populations, but they were focused on – and the pieces of the regulation they were focused on tended to be benign in the sense that it may be more self-evident and that they would not threaten prison security. Although what I just read from the disciplinary report, each one of them takes the letters and concludes that the nature and content of the way the letters are expressing  of the institution. Now, that could be an implicit reference to Judge Bybee and Judge Fletcher's notion or suggestion that he's doing it because he wants to agitate against Knopfsenger and knows the word's going to get back to him. Why in the context of managing these kinds of people who are in for violent behavior and belong to a group that's on their list as a terrorist type of organization, why at a minimum wouldn't these folks be entitled to qualified immunity? Because there was no – because they would argue – it's not clearly established that this kind of over-the-top language is protected under pecuniary. Yeah, let me answer that in two ways. One is by reference to Brooks, Loggins, and McNamara. Those cases all involved inflammatory, racial, insulting language. You can compare and contrast them, but they're equally offensive in different ways. No, he's talking more than just that. He's talking about somebody's head getting bashed in by a fellow prisoner. Right, right. And he's talking about getting Knopfsenger in a ring so he can beat him up physically. Right. And so let me get to that. Let me just say one thing about Brooks and Loggins and McNamara. They all involved qualified immunity issues. They all found against the prison officials unqualified immunity. To your point, Your Honor, here's what the grievance said in Bradley. Then you wonder why things happen like that guard getting beat down. I suggest you talk to this woman and have her act professionally instead of like a child. That's not much different. Oh, that's a lot different. And that was also an access to courts case. That was a letter that was written specifically to prison officials, and yet the court in Bradley found that letter and that correspondence to be protected. Yes, because he was filing a grievance, and it was internal communication on his access to courts. And so there's an access to courts issue, whereas here there's the First Amendment rights and the outside correspondence, and they tend to balance each other out. And the Supreme Court has said that in the context of outgoing correspondence, it's the First Amendment rights of the outside correspondent that brings to bear this test that is much less permissive to the prison officials. So we're really protecting not his First Amendment rights. We're protecting the rights of his family to get these letters. And that's what the Martinez court said. And these are letters that he directed to outside correspondence. He testified to that effect. There has been no refutation of that other than that he knew that his mail was being censored. But then we've got to go back to Bradley, because what Bradley said was that it takes little imagination to figure out how to implement these rules so that these statements are invisible to people in prison operations. So when the panel asks questions and defendants make this argument about how it was a circuitous route to get to Nossiger, the only way that letter can get to Nossiger is if the ODOC reads this Court's opinion in Bradley and says, we don't care. We're going to show it to the prison officers anyway. He knew that his mail would be read by the mailroom staff. He had every reason to believe that this group of defendants would comply with this Court's mandate in Bradley. Well, it was more like a suggestion in Bradley. You accurately quote the language in Bradley, but I'm not sure it was a mandate. I'm sorry. What was your last comment? I'm not sure it was. You accurately quote the language in Bradley where Judge Goodwin says they can avoid the problem of us going back to the prison staff by segregating the function of the mailroom from the other. You overstated, at least in my view, as reading Bradley as a mandate. Okay. I think it was a suggestion as to a solution that the prison might adopt. Right. And I agree with that. It was a suggestion, and it's a suggestion that ODOC here has not implemented. And that's the only way these letters can get to Nossiger. I've got two questions, and we've already used up at least a year or two minutes. But first, on the question of good time credits, what do we know about good time credits? Anything other than what we've heard, that it was a disputed question of fact as to whether or not he lost good time credits? Yeah, there's two things that I would point you to. One is the declaration of Jacob Barrett, paragraph 38 at ER 292 to 93. Go slowly. Paragraph 38? Paragraph 38. Yeah. ER 292 to 93. And he testifies there under oath that he was denied 10 percent earned good time credits for noncompliance with IITP compliance as a result of the violations here. The second thing that I would point Your Honor to is ER 85, which is the declaration of Bethany Smith, paragraph 7. I'm sorry. Give me that cite again. ER 85. ER 85. Okay. And that's where Ms. Smith testifies that he's not eligible for earned good time credits. But she goes on to say, quote, only the board of parole and post-prison supervision may hold a hearing, consider inmate Barrett's likelihood of rehabilitation, and set a release date. If the ‑‑ if Barrett is correct that he lost good time credits, does the prison have to memorialize that someplace? Does it have to be in a record someplace?  In his declaration, he refers to ‑‑ Because this shouldn't really be an argument of fact that Barrett says, somebody told me that I lost 10 percent of my good time credits. And the prison comes and says, oh, no, we didn't tell him that. And then we have a jury have to weigh that. This is either on a record or it's not on a record, right? I mean, this is ‑‑ this should be a matter of recordkeeping. If it's not in the files that says he's lost 10 percent, then he hasn't lost 10 percent, right? It is his testimony that he has lost 10 percent. Right. If called to testify, he will explain in detail the ways that these infractions, these violations affect his current status in Oklahoma. What happened in the Barrett v. Bilek case in front of the Oregon Supreme Court, though, is very instructive, because the ODOC in that case said, and it's reflected in the Court's opinion, what we did has no impact on Mr. Barrett in Oklahoma. And Mr. Barrett came back and said, oh, yes, it does. And the Oregon Supreme Court said on that record, we can't resolve this issue, and then it moved to the merits. And that's what we're asking this Court to do. We've been in front of this district court judge twice. Mr. Barrett filed his lawsuit in 2006. He has been waiting an awful long time for justice. And we are looking to this Court to put the period at the end of the sentence so that Mr. Barrett knows what his rights are and ODOC finally knows what its obligations  Okay. My second question is as to spoliation. What do we know in terms of, or maybe you can say we don't know anything, but what's the evidence in front of us with respect to whether or not the prison officials had the letters at the time the first complaint was filed, had the letters at the time the second complaint was filed, and so on? ER-76, paragraph 6. Hold on. You're fast and I'm slow. ER-76? Paragraph 6. It's the concise statement of facts that we submitted in the district court, and we stated in that paragraph that the defendants had destroyed the letter. Okay. Wait a minute. I'm on ER-76, paragraph 6. It all says is defendants except the fact in this paragraph. Huh? This is not computing for me. And if you go to ER-295, paragraph 6, that's what they're accepting. Hang on. I apologize for that, Your Honor. That's okay. That's okay. I'm just going to go step by step. Okay. So I'm now on ER-295, and what paragraph am I looking at? Paragraph 6. Paragraph 6. Defendants have since. Since when? Yeah, and since the disciplinary hearing. How do I know that that's what the since is referring to? Because paragraph 5 talks about disciplinary hearing. After a disciplinary hearing, he was fine. Yeah, but that doesn't tell us whether it occurred, whether the destruction occurred before or after the complaint was filed, does it? It doesn't, but I can represent to this Court and I can find the information that you need to decide this issue or resolve it. Is it in the record that we have before us? I think it's in the district court record. I believe there was a motion to compel and a dispute about this entire set of issues. But I'll be candid with the Court here. We don't want a remand on spoliation. We do not want to be back in front of this district court judge again. Our view is that whatever those letters say, it's protected by the First Amendment, and I don't think there's any credible evidence that Mr. Barrett truly intended those letters for Officer Knopfziger. And I also would submit that even if they were intended for Officer Knopfziger, there isn't a single threat in any of those letters. Okay. I got it. Thank you. Thank you. Thank both sides for your arguments. The case of Barrett, and is it Belek rather than Bellicu? Do you know the correct pronunciation of Brian Bellicu or Belek? That meaning Belek? Bellicu. Okay. Well, we've got a disputed question of fact on that, too. Okay. Barrett versus Belek, or Bellicu submitted for decision. The last case on this record is the case of Belek.
judges: Fletcher, Fisher, Bybee